

**FILED**

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

APR 2 0 2015

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | | |
|---|---|---|
| SEALED,<br>        Plaintiffs, | §<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br><br>**SA 15 CV 0315 FB**<br>_____<br><br>**FILED _IN CAMERA_<br>AND UNDER SEAL** |
| v. | §<br>§<br>§<br>§ | **Pursuant to<br>31 USC §3730(b)(2)** |
| SEALED,<br>        Defendants. | §<br>§<br>§ | **Jury Trial Demanded** |

## ATTENTION SEAL CLERK

## FILED IN CAMERA AND UNDER SEAL

## ORIGINAL FALSE CLAIMS ACT COMPLAINT

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF TEXAS, *ex rel.* SUSAN EDWARDS, | § § § § | Civil Action No. |
| **Plaintiffs** | § § | _____ |
| v. | § § | **FILED *IN CAMERA* AND UNDER SEAL** |
| INTEGRATED PAIN ASSOCIATES; CENTRAL TEXAS DAY SURGERY CENTER MANAGEMENT, LLC; CENTRAL TEXAS DAY SURGERY CENTER LIMITED PARTNERSHIP; SCOTT IRVINE, D.O.; ANDREW MCDAVID, M.D.; and ERIC JENKINS, M.D., | § § § § § § § § § | **Pursuant to 31 USC §3730(b)(2)** |
| **Defendants** | § § | **Demand for a Jury Trial** |

## ORIGINAL FALSE CLAIMS ACT COMPLAINT
## OF THE UNITED STATES OF AMERICA AND THE STATE OF TEXAS,
### *ex rel.* SUSAN EDWARDS

## INTRODUCTION

1.  *Qui tam* relator Susan Edwards ("Relator" or "Edwards"), by and through counsel, individually and on behalf of the United States of America and the State of Texas, files this Complaint against Defendants Integrated Pain Associates ("IPA"); Central Texas Day Surgery Center Management, LLC; Central Texas Day Surgery Center Limited Partnership; Scott Irvine, D.O.; Andrew McDavid, M.D.; and Eric Jenkins, M.D. (collectively, "Defendants") to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), and the Texas Medicaid Fraud Prevention Act, Texas Human Resource Code § 36.001, *et seq.* ("TMFPA").

2

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

2.      This case concerns several interwoven schemes of fraudulent coding, and ultimately, billing to Medicare, Tricare, and Medicaid by two affiliated medical practices, IPA and CTDSC (an ambulatory surgical center owned by IPA located in the same building as one of IPA's practices), as well as Scott Irvine, D.O. (the owner of IPA), Andrew McDavid, M.D., and Eric Jenkins, M.D.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action under the FCA because it is an action arising under the laws of the United States, specifically 31 U.S.C. §§ 3729, *et seq*. This Court has supplemental jurisdiction over the counts relating to the TMFPA because those counts are based on the same underlying nucleus of facts underlying the FCA claims.

4.      This Court has personal jurisdiction over the Defendants because the Defendants may be found in the State of Texas and within this judicial district, and the Defendants have extensive and deliberate contacts with the State of Texas and this district.

5.      Venue is proper in this Court under 28 U.S.C. §1391(c) and 1395(a) because the complained of illegal acts occurred within this judicial district, Defendants reside in this district, and because Defendants transact significant business within this judicial district.

## PARTIES

6.      Relator Susan Edwards is a resident of the State of Texas. She is a Compliance Officer and the Director of Operations at Medical Office Management II, Ltd. ("MOMI"). Edwards is a Medical Assistant and Certified Professional Coder by training.

7.      On March 25, 2015, Edwards voluntarily disclosed substantially all material evidence and information that she possesses regarding the Defendants' fraudulent scheme by serving a disclosure statement and exhibits on Eric Holder, the Attorney General of the United

States; Mary Kruger, Assistant U.S. Attorney for the Western District of Texas; and Texas Attorney General Kenneth Paxton, Attention Assistant Attorney General Susan Miller.

     **8.**     Edwards brings this action on behalf of herself and the United States of America and the State of Texas. Edwards possesses direct and independent knowledge about Defendants' wrongful acts resulting in the submission of false claims and commission of other unlawful acts with respect to Medicare, Medicaid and Tricare. She is the original source of the information provided and allegations made in this Complaint. If a public disclosure of Edwards' allegations was made prior to the filing of this suit, Relator is nevertheless the original source of all allegations contained within this complaint.

     **9.**     Defendant Integrated Pain Associates is a Texas corporation with six locations in the State of Texas. IPA is registered to 4005 El Capitan Drive, Temple, Texas, which is also the home address of its owner, Dr. Scott Irvine.

     **10.**     IPA maintains six offices in the State of Texas, which are located at:

     a.     3800 S. W.S. Young, Suite 201, Killeen, TX 76542;

     b.     1512 Leander Road, Georgetown, TX 78628;

     c.     1700 Brazos Avenue, Rockdale, TX 76567;

     d.     1905 SW H K Dodgen Loop, Temple, TX 76502;

     e.     806 N Crockett Avenue, Cameron, TX 76520; and

     f.     1000 W Hwy 6 Suite 130, Waco, TX 76712.

     **11.**     Central Texas Day Surgery Center ("CTDSC") is an ambulatory surgical center ("ASC"), which is owned by IPA and operated by Central Texas Day Surgery Center Management, LLC and Central Texas Day Surgery Center Limited Partnership.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

12.    Central Texas Day Surgery Center Management, LLC is a limited liability company organized under the laws of the State of Texas. Its registered address is 1802 Forest Hills Drive, Harker Heights, Texas 76548, which is also the home of James Mellon, its registered agent.

13.    Central Texas Day Surgery Center Limited Partnership is a limited partnership organized under the laws of the State of Texas and is registered to 3800 S W.S. Young Drive, Suite 204, Killeen, Texas 76542. Central Texas Day Surgery Center Limited Partnership's registered agent is also James Mellon.

14.    Scott Irvine, D.O. is an anesthesiologist who specializes in chronic pain treatment. Irvine performs services at both IPA and CTDSC. Irvine is the owner of IPA.

15.    Andrew McDavid, M.D. is an anesthesiologist who specializes in chronic pain management. McDavid performs services at both IPA and CTDSC.

16.    Eric R. Jenkins, M.D., is an anesthesiologist with board certifications in anesthesiology and pain medicine. Jenkins performs services at IPA and CTDSC.

**RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY**

17.    When the Defendants herein are collectively referred to as the "Defendants," the allegations contained in that sentence and paragraph are alleged severally against each separate Defendant.

18.    The Defendants are all related persons and entities, in that their operations are inextricably intertwined and they were acting in concert together to foster, facilitate and promote the false, fraudulent and unlawful conduct alleged herein. As such, each of the Defendants is jointly and severally liable for the actions of each Defendant. It is alleged that employees and

5

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

officers of all the Defendants acted in harmony and concert to commit the unlawful acts specified in this Amended Complaint.

19.     IPA and CTDSC are related entities sharing common elements of management, finances, control, supervision, and reporting and thus are mutually, jointly, and severally liable under legal theories of *respondeat superior*, and the past, present and continuing relations and dealings by and between these related entities and the individual Defendants are so inextricably intertwined that for purposes of this suit, some or all of them should be considered as a single business entity, and/or a joint enterprise in pursuing the scheme made the basis of this suit.

## FACTUAL ALLEGATIONS

**A.    The Defendant practices are related entities, and the Defendant physicians all bill for services performed at the Defendant practices.**

20.     Defendant Integrated Pain Associates is a three-physician practice which focuses on pain treatment and management.

21.     IPA maintains six offices in the State of Texas in: Killeen, Georgetown, Rockdale, Temple, Cameron, and Waco.

22.     The three physicians who perform services at IPA are Defendants Scott Irvine, Andrew McDavid, and Eric R. Jenkins. All three physicians are board certified in anesthesiology.

23.     Three nurse practitioners also perform services at IPA and bill for services performed there: Jesse Dedrick, Krista Strawser, and Ashlee Quick.

24.     IPA is owned by Dr. Scott Irvine.

25.     Defendants Central Texas Day Surgery Center Management, LLC and Central Texas Day Surgery Center Limited Partnership operate Central Texas Day Surgery Center.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

26.    CTDSC is an ambulatory surgery center located in the same building as IPA.

27.    Defendant IPA owns CTDSC, having purchased it in 2012.

28.    Defendants IPA and CTDSC, through Irvine, McDavid, Jenkins, and other employees, frequently perform procedures known as facet join injections.

**B.    Facet joint injections and transforaminal epidural steroid injections**

29.    Facet joints are connections of the joints of the human spine. Nerves pass through these joints and travel from the spinal cord to all parts of the human body.

30.    Facet joints can become swollen and cause pinched nerves, which is often labeled "facet joint syndrome."

31.    Facet joint injections involve injecting anesthetic and/or anti-inflammatory medications into a joint suspected of having this syndrome.

32.    If immediate relief is obtained after such an injection, the condition is typically referred to facet joint syndrome.

33.    Facet joint injections can be both diagnostic and therapeutic in nature.

34.    Defendants IPA and CTDSC, through Irvine, McDavid, Jenkins, and other employees, frequently perform procedures known as transforaminal epidural injections or transforaminal epidural steroid injections ("TFESI").

35.    This type of injection involves injecting anti-inflammatory steroids directly into the epidural space, which is the area of the human spine directly surrounding the spinal cord.

36.    Foramen are the openings in the side of spinal vertebrae through which nerves branch off from the spinal cord and travel to various parts of the human body.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

37.    Typically, TFESI injections are administered once as a "diagnostic injection" in order to determine whether the correct source of pain for the patient has been located, as well as to determine the effectiveness of the treatment for the patient's needs.

38.    If this type of treatment is determined to be beneficial to the patient, subsequent therapeutic injections are given.

39.    Medicare reimbursements for both types of injections have risen significantly in recent years.

40.    The Medicare intermediary for Texas is Novitas Solutions.

41.    The Local Coverage Determination that Novitas issued for Texas states, in part:

> Medicare does not expect that an epidural block or sympathetic block would be provided to a patient on the same day as facet joint injections. Multiple blocks on same day could lead to improper or lack of diagnosis. Coverage will be extended for only one type of procedure during one day/session of treatment unless the patient has recently discontinued anticoagulant therapy for the purpose of interventional pain management.

42.    Spinal injections must be coded, according to industry practice and custom, by labeling the area injected with two vertebrae.

43.    Thus, if an injection is given between the L4 vertebrae and L5 vertebrae, such an injection should be labeled to clearly identify the two vertebrae involved, with a label such as "L4-L5" or "L4-5."

44.    Failure to follow this protocol can result in overbilling for more injections than were actually performed.

**C.    Relator Susan Edwards is a coding expert who discovered the fraud committed by Defendants after taking her brother to IPA for treatment.**

45.    Relator Susan Edwards is a coding expert with extensive experience and training in the fields of medical billing and proper coding practices.

8

46.    Edwards is a Medical Assistant and a Certified Professional Coder, as recognized by the American Academy of Professional Coders.

47.    Edwards has experience with coding for a number of areas of medicine, including, but not limited to: emergency room care, OB/GYN, podiatry, primary care, radiology, spinal surgery, and anesthesia.

48.    Edwards is employed at Medical Office Management II, Ltd., which provides billing services for a wide array of medical specialties, including: anesthesiology, internal medicine, pain management, rehabilitation and physical therapy, and spinal surgery.

49.    Edwards serves as a Compliance Officer and Director of Operations at MOMI.

50.    In this position, Edwards trains physicians and their staffs on proper billing and coding practices throughout southeastern and central Texas.

51.    Edwards also publishes a monthly newsletter with a readership of more than 100 physicians. This newsletter covers coding and compliance issues.

52.    Edwards has a 49-year-old brother named Charles Rickard, Jr.

53.    Rickard suffered a traumatic brain injury a number of years ago, which left him unable to care for himself.

54.    Rickard now lives with Edwards, and she serves as his guardian and primary caregiver.

55.    Rickard is a recipient of disability benefits.

56.    In or about November 2013, Edwards took Rickard to the office of IPA because Rickard was suffering from severe lower back pain.

57.    At IPA, Defendant Irvine treated Rickard and diagnosed him with a herniated lumbar disc.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**58.**     While at IPA, IPA recommended that Rickard undergo two facet joint injections.

**59.**     Based on her experience coding these types of procedures, Edwards did not believe such injections were medically necessary.

**60.**     Edwards ultimately cancelled these appointments because more conservative measures recommended by Irvine seemed to work for Rickard.

**61.**     Irvine also ordered an MRI for Rickard. The MRI was performed, but the results were never shared with Rickard or Edwards.

**62.**     When Edwards received the Explanation of Benefits from Medicare for Rickard, she noticed there were charges for drug tests, which she did not believe IPA performed.

**63.**     Rickard also had no recollection of these tests.

**64.**     Nonetheless, Medicare paid $910.08 for these tests.

**65.**     Rickard had two follow-up appointments at IPA.

**66.**     During both appointments, a nurse practitioner treated Rickard.

**67.**     Yet when Edwards received the Explanation of Benefits from Medicare, Rickard's follow up visits were billed under the Unique Provider Identification Number (UPIN) of Defendant Dr. Andrew McDavid.

**68.**     McDavid never treated or even met Rickard.

**69.**     Nonetheless, IPA billed a February 6, 2014 visit for Rickard under the UPIN of McDavid.

**70.**     These practices by Defendants made Edwards suspicious.

**71.**     Defendants IPA and CTDSC are former clients of MOMI.

**72.**     Edwards then began to look into the billing practices of IPA and CTDSC.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

73.    Edwards also began to perform research on fraud as it pertained to billing practices.

74.    After undertaking these actions, Edwards discovered a number of fraudulent activities committed by Defendants involving billing to Medicare, Tricare, and Medicaid.

**D.    Edwards uncovered further evidence that Defendants bill the government for medical services which are not actually performed.**

75.    Upon examination of a number of records from IPA and CTDSC, Edwards found a number of examples where the practices billed either Medicare, Tricare, or Medicaid for medical services which they did not perform.

76.    After Edwards took her brother, Charles Rickard, to IPA, she received an Explanation of Benefits for services performed on or about April 8, 2014.

77.    Edwards noticed charges for a number of drug tests allegedly performed on Rickard for that day.

78.    Edwards had no memory of these tests having been performed.

79.    As well, when questioned by Edwards, Rickard also could not remember providing a urine sample in order for such tests to be carried out.

80.    Nonetheless, IPA billed for Medicare for a drug screen for multiple drug classes using the CPT Code G0431 on April 8, 2014

81.    IPA also billed Medicare for a test for alcohol levels on April 8, 2014 using the CPT Code 82055-QW.

82.    These tests were billed as services provided by Defendant Irvine.

83.    Medicare paid a total of $88.75 to IPA for these particular tests.

**84.** Additionally, the billing of these services caused Rockdale Blackhawk LLC to bill $819.52 for testing for a number of various types of drugs.

**85.** Based upon her coding expertise, Edwards found a number of instances of improperly coded spinal injections, which allowed for the billing of more spinal injections than medical documentation indicates occurred.

**86.** Proper coding for spinal injections must always indicate two vertebrae.

**87.** The two vertebrae indicated in the coding of a particular procedure must be the two vertebrae between which an injection is administered.

**88.** The dictation section of the procedure notes of a chart for a patient named L.B. indicate that on November 11, 2013, Defendant Irvine performed three facet joint injections for the L3-4, L4-5, and L5-S1 levels at CTDSC.

> C-arm is utilized for placement of the radiofrequency lesioning needles. The fluoroscopic beam is oriented and anterior to posterior position with approximately 15° of ipsilateral obliquity and approximately 10° of caudal rotation. The pedicle, transverse process, and superior articular process is noted at the L3-4, L4-5, L5-S1 levels. Once these anatomic locations are identified a skin wheal of local anesthetic, specifically 1% lidocaine plain is placed at a point inferior to the junction of the transverse process and the superior articular facet as noted on the fluoroscopic screen. A 20-gauge 10 cm radiofrequency lesioning needle with a 10 mm curved active tip was inserted through the skin just inferior to the junction of the transverse process and superior articular facet. Utilizing C-arm guidance bony contact was made at the junction of the transverse process and the superior articular facet and then walked over to the point where the medial branch courses along his union superior to the mamo accessory ligament. This is done at all 3 levels L3-4, L4-5, L5-S1. Each level has C-arm fluoroscopic confirmation in the AP view. The C-arm was rotated into the lateral projection and confirmation of the needle traversing the base of the superior articular facet is confirmed. In addition, the active needle tip is shown to be posterior to the neural foraminal canal with a clear column of bone anterior to the tip of the lesioning needle. The cannula was then stimulated at approximately 5 Hz demonstrating reproduction of low back, hip, and buttock pressure similar to the baseline complaint pattern. At no point was a radicular pattern described. Motor stimulation is undertaken at 2 Hz and multifidus stimulation observed. No motor stimulation noted below the lumbar spine region. After confirmation of correct needle placement with both fluoroscopy and stimulation; 1 cc of 2% lidocaine as deposited through the cannula at the L3-4 L4-5 L5-S1 levels. Prior to injection negative aspiration for blood is noted. A lesion tract is made at 80° C. for 90 seconds. A second lesion track is made at 180° opposite the first lesion tract. Prior to second lesion tracts an additional lateral view confirms no migration of the cannula. Again this lesion tract is done for 90 seconds at 80° C. Therefore, 2 lesion tracts at each level.

**89.** However, near the top of the chart, in a section labeled "CPT Codes," Defendant CTDSC lists four facet joint injections with one reflecting the CPT Code 64635 ("Destroy lumb/sac facet jnt.) and three reflecting the CTP Code 64636 ("Destroy l/s facet jnt addl.").

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**Central Texas Day Surgery Center**
Scott A. Irvine, D.O.
3800 S. WS Young Suite 204 Killeen, TX  76542
Office: (254)213-0489     Fax: (254)213-0875

**PATIENT NAME:** I█████ █REDACTE█

**SSN:** █REDACTE█

**Address:** █REDACTED█

**CHART NUMBER:** 6580

**DATE of Birth:** █REDACTED█

**DATE of visit:** 11/11/2013

**ATTENDING Physician:** Scott A. Irvine D.O.

**Type of Visit:** Procedure

**Referring Physician:** Bertha  Gayton

**PROCEDURE NOTE**

**RADIOFREQUENCY LESIONING LUMBAR SPINE LEFT:**

Levels treated L2-3, L3-4, L4-5, L5-S1.

**CPT Codes**
64635 x 1
64636 x 3

Fluoroscopic guidance for radiofrequency lesioning: 77003

90.     The CMS-1500 submitted to Medicare also showed four injections, one reflecting the CPT Code 64635 ("Destroy lumb/sac facet jnt.) and three reflecting the CTP Code 64636 ("Destroy l/s facet jnt addl.").

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 11112013 | 11112013 | 24 | 64635 | LT | 1234 | 1512.00 | 1 | 1D NPI 085869801 1730175035 |
| 2 | 11112013 | 11112013 | 24 | 64636 | LT | 1234 | 635.00 | 1 | 1D NPI 085869801 1730175035 |
| 3 | 11112013 | 11112013 | 24 | 64636 | 59 LT | 1234 | 635.00 | 1 | 1D NPI 085869801 1730175035 |
| 4 | 11112013 | 11112013 | 24 | 64636 | 59 LT | 1234 | 635.00 | 1 | 1D NPI 085869801 1730175035 |

91.     The claim submitted to Medicare for L.B.'s facet injections was for four injections when the procedure notes on patient L.B.'s chart indicated Dr. Irvine only performed three injections.

92.     Billing reports for both CTDSC and IPA reflect charges for four injections given to patient L.B. on November 11, 2013 indicating that both CTDSC and IPA are billing for services provided to L.B. when L.B. could have only received facet injections from one of those facilities.

93.     Patient L.B. is just one example of many discovered by Edwards in which Defendants charged for services that were not supported by required documentation.

94.     Another example of Defendants charging for services that are not supported by proper documentation is Tricare beneficiary A.M.

95.     A.M. was seen by Dr. Sardella on December 18, 2013.

96.     A.M.'s chart indicated Dr. Sardella treated "Lumbosacral Medial Branch S1, S2, and S3, RIGHT."

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**Central Texas Day Surgery Center**
Paul A. Sardella, M.D.
3800 S. WS Young Suite 204 Killeen, TX 76542
Office: (254)213-0489       Fax: (254)213-0875

PATIENT NAME: █RED █REDACTE█

SSN: █REDACTED█

Address: █REDACTED█

CHART NUMBER: 7150

DATE of Birth: █REDACTED█

DATE of visit: 12/18/2013

ATTENDING Physician: Paul A. Sardella, M.D.

Type of Visit: Procedure: Right sacral lateral branch block

Referring Physician: DARNALL HOSPITAL

PROCEDURE NOTE: This patient is being treated for low back pain and is exquisitely tender over his right SI joint provocative maneuvers for low back pain in this area such as a Gaenslens test, Faber test, and compression test of the sacroiliac joint. We have done SI joint injection with some relief in this area so we are hoping to proceed with these blocks today for diagnostic purposes and also to pursue RFA In the future.

**Lumbosacral Medial Branch S1, S2, S3, RIGHT:** .

Levels treated medial branch S1, S2, S3.

CPT Codes
64493.x 1
64494 x 2

Fluoroscopic guidance for lumbosacral medial branch blocks: 77003

97.     As indicated previously, the proper method for documenting facet injections requires stating between which vertebrae the injection was given. As such, if three vertebrae are listed, it means that two facet injections should have been given to the patient.

98.     Despite only indicating two facet injections between three vertebrae, CTDSC submitted a CMS-1500 form to Tricare for three facet injections under CPT codes 34493, 64494, and 64495 in the amount of $667.00, $345.00, and $350.00 for each injection respectively.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 12182013 | 12182013 | 24 | 64493 | SG | 123 | 667.00 | 1 | NPI 1346203585 |
| 2 | 12182013 | 12182013 | 24 | 64494 | SG | 123 | 345.00 | 1 | NPI 1346203585 |
| 3 | 12182013 | 12182013 | 24 | 64495 | SG | 123 | 350.00 | 1 | NPI 1346203585 |

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

99.    CTDSC received payment for all three of these injections for patient A.M. from Tricare on or around January 7, 2014:



| ClaimID | Svc Date | Proc / Units | Billed / Allowed | Not Allowed | Deduct. | Coins / Copay | Payment |
|---------|----------|--------------|------------------|-------------|---------|---------------|---------|
| n/a | 12/18/2013 | 64493:SG / | $667.00 / $309.60 | $357.40 / CO-45 remark MA109 | | | $309.60 |
| n/a | 12/18/2013 | 64494:SG / | $345.00 / $309.60 | $35.40 / CO-45 remark MA109 | | | $309.60 |
| n/a | 12/18/2013 | 64495:SG / | $350.00 / $309.60 | $40.40 / CO-45 remark MA109 | | | $309.60 |

100.    CTDSC and IPA also double-billed Tricare for the services provided to A.M. on or around December 18, 2013, as both facilities submitted claims to Tricare for A.M.'s facet injections.

101.    The lack of documentation and double-billing resulting in Medicare payments to CTDSC and IPA occurred for patient M.W. on or around December 12, 2013, as well.

102.    CTDSC and IPA use "template charts," or pre-written exemplars, which both entities copy and paste into the patients' charts for the description of injection services, and then they arbitrarily place CPT codes near the top of the chart to indicate what CTDSC and IPA want to be billed to Medicare.

**E.    Defendants Submit Claims for Services That Are Not Medically Necessary.**

103.    To be reimbursed by Medicare, a provider must perform services that are "are [] reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

104.    Tricare has similar requirements for medical necessity. 32 C.F.R. § 199.15(b)(1) ("Broadly, the [Tricare] program of quality and utilization review has as its objective to review

16

the quality, completeness and adequacy of care provided, as well as its necessity, appropriateness and reasonableness.").

105.    Tricare regulations note the similarity of the program to Medicare and call for Medicare rules to be "used as a model." See 32 C.F.R. §199.15(a)(6).

106.    Defendants violate these regulations when they perform and bill for services that are not medically necessary for the diagnosis or treatment of the patient's illness or injury or to improve the functioning of the patient.

107.    For example, the drug tests and injections Defendants performed on Edwards' brother, Mr. Rickard, were not medically necessary and the drug tests were not performed.

108.    The Medicare Local Coverage Determination for Texas, in its limitations section regarding facet joint injections, states that "Medicare does not expect that an epidural block or sympathetic block would be provided to a patient on the same day as facet joint injections. Multiple blocks on same day could lead to improper or lack of diagnosis."

109.    Tricare beneficiary T.A. was seen by Dr. Irvine at CTDSC on or about November 11, 2013.

110.    CTDSC created two different charts for T.A.'s November 11, 2013 visit.

111.    The first chart for T.A., produced by CTDSC, bearing the date of November 11, 2013, has three injections listed in its "CPT Code" section: 64493, 64494, and 64495. 64493 is the CPT code for "Inj paravert f jnt l/s 1 lev." 64494 and 64495 are the CPT codes for "Inj paravert f jnt l/s 2 lev" and "Inj paravert f jnt l/s 3 lev," respectively.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**Central Texas Day Surgery Center**
Scott A. Irvine, D.O.
3800 S. WS Young Suite 204 Killeen, TX 76542
Office: (254)213-0489      Fax: (254)213-0875

PATIENT NAME: T█REDA█ A█REDACTE█

SSN: █REDACTE█
█D█

Address: █REDACTED████████

CHART NUMBER: 1694

DATE of Birth: █REDACT█

DATE of visit:  11/11/2013

ATTENDING Physician:  Scott A. Irvine D.O.

Type of Visit: Procedure

Referring Physician: CHARLES  MITCHELL

PROCEDURE NOTE

LUMBAR SPINE  FACET JOINT INJECTIONS LEFT:

Levels treated L3-4, L4-5, L5-S1.

CPT Codes:

64493 - First  level, with fluoroscopy
64494 - Second level, with fluoroscopy
64495 - Third level with fluoroscopy

112.     T.A.'s second chart bears two codes in its "CPT Code" section: 64483 and 64484. 64483 is the CPT code for "Inj foramen epidural l/s." Likewise, 64484 is the CPT code for "Inj foramen epidural add-on. Thus, this chart for T.A. charges for two "transforaminal epidural steroid injections" into the lumbar spine on November 11, 2013.

18

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT



**Central Texas Day Surgery Center**
Scott A. Irvine, D.O.
3800 S. WS Young Suite 204 Killeen, TX 76542
Office: (254)213-0489     Fax: (254)213-0875

PATIENT NAME: T REDAC A REDACTE

SSN: REDACTE

Address: REDACTED

CHART NUMBER: 1694

DATE of Birth: REDACT

DATE of visit: 11/11/2013

ATTENDING Physician: Scott A. Irvine D.O.

Type of Visit: Procedure

Referring Physician: CHARLES  MITCHELL

PROCEDURE NOTE

LUMBAR SPINE TRANSFORAMINAL EPIDURAL STEROID INJECTION LEFT L4-L5:

CPT Codes:
64483
64484

113.    The CMS-1500 form submitted to Tricare for T.A.'s November 11, 2013 services were for all five injections, 64493, 64494, 64495, 64483, and 64484.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 11112013 | 11112013 | 24 | 64483 | SG LT | 12 | 1048.00 | 1 | NPI | 1730175035 |
| 2 | 11112013 | 11112013 | 24 | 64484 | SG LT | 12 | 670.00 | 1 | NPI | 1730175035 |
| 3 | 11112013 | 11112013 | 24 | 64493 | SG LT | 34 | 667.00 | 1 | NPI | 1730175035 |
| 4 | 11112013 | 11112013 | 24 | 64494 | SG LT | 34 | 345.00 | 1 | NPI | 1730175035 |
| 5 | 11112013 | 11112013 | 24 | 64495 | SG LT | 34 | 350.00 | 1 | NPI | 1730175035 |

114.    According to Tricare's remittance notice dated on or about December 10, 2012, Tricare reimbursed CTDSC for all five injections in the amount of $1,368.20.

19

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

| PERF PROV | SERV DATE | POS | NOS | PROC | MODS | BILLED | ALLOWED | DEDUCT | COINS | GRP/RC-AMT | | PROV PD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME A | .T███████ | | | | HIC<br>ICN | ████████ | | ACNT | ████████ | | ASG Y | |
| | | | | | | | | MOA | | | | |
| 1962459610 1111 111113 | | 001 | 64483 | SGLT | | 1048.00 | 309.60 | .00 | 25.00 | CO-45 | 738.40 | 284.60 |
| REM: N180 | | | | | | | | | | PR-3 | 25.00 | |
| 1962459610 1111 111113 | | 001 | 64484 | SGLT | | 670.00 | 309.60 | .00 | .00 | CO-45 | 160.40 | 309.60 |
| REM: MA109 | | | | | | | | | | | | |
| 1962459610 1111 111113 | | 001 | 64493 | SGLT | | 667.00 | 154.80 | .00 | .00 | CO-45 | 512.20 | 154.80 |
| REM: MA109 | | | | | | | | | | | | |
| 1962459610 1111 111113 | | 001 | 64494 | SGLT | | 345.00 | 309.60 | .00 | .00 | CO-45 | 35.40 | 309.60 |
| REM: MA109 | | | | | | | | | | | | |
| 1962459610 1111 111113 | | 001 | 64495 | SGLT | | 350.00 | 309.60 | .00 | .00 | CO-45 | 40.40 | 309.60 |
| REM: MA109 | | | | | | | | | | | | |
| | | | | CLAIM TOTALS: | | 3080.00 | 1393.20 | .00 | 25.00 | | 1711.80 | 1368.20 |

115.    These different types of injections, given on the same day in the same region of the back, suggest a lack of medical necessity for one or both of these types of injections billed to Tricare.

116.    Additionally, both CTDSC and IPA charged Tricare for T.A.'s injections performed on or about November 11, 2013, indicating Defendants double-billed for T.A.'s services.

117.    Patient T.A. is just one of many examples of patients for whom CTDSC charged for an excess number of injections, indicating the injections either are not truly performed, or are medically unnecessary.

**F.    Defendant IPA Submits Claims Indicating a Service was Provided "Incident to" a Doctor's Service even when the Service is not Provided Incident to.**

118.    When services are billed under a nurse practitioner or physician's assistant's own Unique Provider Identification Number ("UPIN"), Medicare reimburses the facility at a rate of 85% of what it would pay for the same services billed under a physician's UPIN.

119.    Alternatively, the services of a nurse practitioner or physician's assistant can be billed "incident to" a physician's services, in which the physician's UPIN is used.

120.    For proper "incident-to" billing, Medicare generally requires that the services be "an integral, though incidental, part of the service of a physician (or other practitioner) in the

course of diagnosis or treatment of an injury or illness," 42 C.F.R. § 410.26(b)(2), and "services and supplies must be furnished under the direct supervision of the physician (or other practitioner)." *Id.* at § 410.26(b)(5).

121.    Direct supervision for the purposes of incident-to services means that the physician whose UPIN is being billed under must be within the four walls of the facility while the services are being performed by the nurse practitioner or physician's assistant. The physician need not be in the exam room with the nurse practitioner or physician's assistant, but the physician must be physically present and reachable within the four walls of the facility.

122.    The billing of incident-to services does not require each occasion of an incidental service performed by a non-physician practitioner always be the occasion of a service actually rendered by the physician. It does mean that **there must have been a direct, personal, professional service furnished by the physician to initiate the course of treatment of which the service being performed by the non-physician practitioner is an incidental part**, and there must be subsequent services by the physician of a frequency that reflects the physician's continuing active participation in and management of the course of treatment. CENTERS FOR MEDICAID & MEDICARE SERVICES, MEDICARE BENEFIT POLICY MANUAL, CHAPTER 15 – COVERED MEDICAL AND OTHER HEALTH SERVICES § 60.2 (Rev. 202, 12/31/14), *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf (emphasis added).

123.    When Mr. Rickard was seen at IPA, Dr. Irvine was Mr. Rickard's original doctor who came and evaluated Mr. Rickard.

124.    On subsequent visits, nurse practitioners saw Mr. Rickard.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

125.    Despite being originally seen by Dr. Irvine and subsequently treated by nurse practitioners, IPA billed for Mr. Rickard's visits under Dr. McDavid's UPIN.

126.    Additionally, Medicare beneficiary M.G. was scheduled for an appointment at IPA with nurse practitioner Krista Strawser on September 27, 2013, to "discuss more injections for chest pain."

| 9:15 AM | 4179 | √ | MREDA cRE | REDACTED | Krista Strawser | Follow up | Main Location | $0.00 |
| Notes : discuss more injections for chest pain-AMC | | | | Ins.Name : TRICARE | | | Ins.ID : REDACT | |

127.    M.G.'s chart indicates she was being treated for rheumatoid arthritis and costochondritis, and it states that nearly a year before this visit, she "received a sternal injection and costochondral injections underneath her bilateral breasts." M.G.'s chart also states that M.G. requested to repeat the chest injections.

22

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**Integrated Pain Associates**
Andrew J. McDavid, M.D.
3800 S. WS Young Suite 201 Killeen, TX 76542
Office: (254)245-9175 Fax: (254)213-7771

PATIENT NAME: M█REDA█ █RE█

SSN: REDACTED

Address: REDACTED

CHART NUMBER: 4179

DATE of Birth: REDACTE█

DATE of visit: 09/27/2013

ATTENDING physician: Andrew J. McDavid, M.D.

Type of Visit: Established Patient

Referring Physician: J  KYLEBERG

Chief Complaint: Patient is visiting the clinic to discuss injections for chest pain.

Change in Symptoms / New Problems: Mrs. G█ is in clinic today to discuss injections for her chest wall pain. She is currently being treated for widespread pain due to the rheumatoid arthritis and costochondritis. On 9/19/12 she received a sternal injection and costochondral injections underneath her bilateral breasts. She reports this provided her with 100% pain relief with the assistance of her medications until one month ago. At that time her medications no longer adequately controlled her pain due to the severe increase of pain. Today she is requesting to repeat these injections at this time.

Today she complains of pain underneath her breasts. She describes her pain as tiring and stool. She states her pain is constant. Aggravating factors include bending, walking, and coughing. Alleviating factors include resting and medications. She states her pain is most severe during the day. She states her pain negatively affects her general activity and mood. She states she has not completed physical therapy in the past.

She continues to take Norco as needed for pain control. She has refills remaining on her current prescription and does not need any refills at this time. She denies any issues, side effects, or over sedation with her medications. These medications are prescribed to assist with pain control and increase her ability to perform ADLs. Otherwise she denies any further issues or questions, or concerns at this time.

Past Medical History:  Hypertension
Chronic Pain
Fatigue
Asthma: dx 2012
Lumbago
Rheumatoid Arthritis

128.    M.G.'s chart further indicates that the nurse practitioner went over the plan of care and potential side effects with the patient.

129.    M.G.'s chart, under the "Medical Necessity" heading also states in part "[t]he patient has tried conservative measures and failed **him** to date." (Emphasis added).

130.    M.G.'s notes refer to M.G. with the masculine pronoun despite M.G. being female.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

131.    Using male pronouns to describe female patients in chart notes is one red flag that the note has been copied and pasted from somewhere else, and that the provider did not really perform the plan of care, service, or discussion as indicated on the patient's chart.

132.    At the end of M.G.'s chart, Dr. McDavid notes that he discussed nurse practitioner Strawser's plan of care and agreed with Strawser's "above note."

133.    Both Strawser and Dr. McDavid signed the patient's chart.

---

**Integrated Pain Associates**
Andrew J. McDavid, M.D.
3800 S. WS Young Suite 201 Killeen, TX 76542
Office: (254)245-9175  Fax: (254)213-7771


Risks: The above procedures have been recommended after full discussion of the risks and benefits. The risks of the above procedures have been explained to the patient at length. The risks which have been explained include but are not limited to; worsening of pain, nerve injury, infection, allergic reaction, bleeding, bruising, damage to the spinal cord, paralysis, death, failure to provide relief and other and anticipated outcomes. The patient voiced understanding and acceptance of these and other potential risks and injuries of the procedures. All questions were answered to the patient's satisfaction.

Medical Necessity: The patient has been scheduled for injection therapy. The procedure is necessary and indicated in order to return the patient to high level of functionality. The patient has tried conservative measures and failed him to date.

Thank you for allowing me to participate in M REDA s care. We will keep you apprised of ongoing treatments, and responses. Again, if there are any questions or concerns please feel free to call the clinic.

*Krista Strawser FNP-BC*

' Krista Strawser FNP-BC'. 09/27/2013 10:16:10 AM (KStrawser)


Adjustments/changes in the patient's care have been reviewed with the nurse practitioner. They have been reviewed with the patient. I personally had oversight in this adjustment, and discussed in detail with the nurse practitioner the risk/benefit of the change in treatment plan. The patient has been informed fully of our change in plan, and conveys understanding about this adjustment. I agree with the above note, and I was personally present in the clinic to discuss adjustments and care face-to-face with the nurse practitioner.

Procedure: After sterile prep and drape injection of the lower sternum and bilateral anterior chest wall just under both breasts was performed. A total white blood 5 cc 0.25% Marcaine and 40 mg of Kenalog was distributed amongst these 3 areas. The patient tolerated the procedure well and left the clinic in stable condition

*Andrew J. McDavid, MD*

24

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**134.** It does not appear that Strawser performed services "incident to" a plan of care set forth by Dr. McDavid.

**135.** Instead, it appears that Strawser actually changed the plan of care for M.G. by ordering new injections, which Dr. McDavid later approved after the fact.

**136.** IPA later billed M.G.'s services to Medicare under the UPIN of Dr. McDavid when it should have been billed under nurse practitioner Strawser's UPIN.

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) | 15. OTHER DATE | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION |
|---|---|---|
| 06 18 2012 | 06 18 2012 | |
| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE: ANDREW J. MCDAVID, MD | 17b. NPI 1477514479 | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES |
| 19. ADDITIONAL CLAIM INFORMATION | | 20. OUTSIDE LAB?  YES ☒ NO |
| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  A. 733 6  B.  C. 786 52  D.  E.  F.  G.  338 4 | | 22. RESUBMISSION CODE / ORIGINAL REF. NO.  23. PRIOR AUTHORIZATION NUMBER |

| 24. DATES OF SERVICE From | To | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT | I. ID QUAL | J. RENDERING PROVIDER ID # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 09272013 | 09272013 | 11 | | 99213 | 25 | 1 | 77 00 | 1 | | NPI | 1477514479 |
| 2 09272013 | 09272013 | 11 | | J3301 | | 23 | 80 00 | 8 | | NPI | 1477514479 |
| 3 09272013 | 09272013 | 11 | | 20552 | | 23 | 149 00 | 1 | | NPI | 1477514479 |

**137.** Billing under Dr. McDavid's UPIN as opposed to nurse practitioner Strawser's UPIN caused the services to be paid at a 15 percent higher rate than justified.

**138.** M.G.'s situation is just one of many examples of Defendants' improper incident-to billing procedures.

**G.    Defendants Know or Should Know That They Are Violating the FCA and TMFPA.**

**139.** Edwards and some of the other staff at MOMI began questioning CTDSC's and IPA's billing practices in or around 2013.

**140.** Instead of correcting its billing practices, CTDSC and IPA terminated their business relationship with MOMI in 2014.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**141.** CTDSC and IPA then hired a number of MOMI's billing staff to perform CTDSC's and IPA's billing in-house.

**142.** Edwards also notes that IPA and CTDSC engage frequently in the act of "chart cloning."

**143.** In other words, Patient A comes in for a procedure. The physician, nurse practitioner, or physician's assistant writes the notation in the patient's chart, which is then used to bill Medicare, Medicaid, or Tricare. When Patient B comes in, the physician or practitioner simply copies and pastes the notation from one chart to another.

**144.** For example, the charts from A.M. and J.D. both bear visit dates of 12/18/2013 at CTDSC for treatment by Dr. Paul Sardella and Dr. Irvine, respectively.

**145.** J.D.'s chart indicates four facet joint injections in the "Lumbosacral Medial Branch S1, S2, S3, S4 RIGHT."

**Central Texas Day Surgery Center**
Scott A. Irvine, D.O.
3800 S. WS Young Suite 204 Killeen, TX 76542
Office: (254)213-0489     Fax: (254)213-0875

PATIENT NAME: J R D REDAC

SSN: REDACTE

Address: REDACTED

CHART NUMBER: 4406

DATE of Birth: REDACT

DATE of visit: 12/18/2013

ATTENDING Physician: Scott A. Irvine D.O.

Type of Visit: Procedure

Referring Physician: ROBERT PERRY

PROCEDURE NOTE

Lumbosacral Medial Branch S1, S2, S3, S4 RIGHT:

Levels treated medial branch S1, S2, S3, S4.

CPT Codes
64493.x 1
64494 x [3]

26

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

146.    A.M.'s chart indicates three facet injections for "Lumbosacral Medial Branch S1, S2, S3, RIGHT."

---

**Central Texas Day Surgery Center**
Paul A. Sardella, M.D.
3800 S. WS Young Suite 204 Killeen, TX  76542
Office: (254)213-0489        Fax: (254)213-0875

PATIENT NAME: A REDACTED M REDACTED

SSN: REDACTED

Address: REDACTED

CHART NUMBER: 7150

DATE of Birth: REDACTED

DATE of visit:  12/18/2013

ATTENDING Physician:  Paul A. Sardella, M.D.

Type of Visit: Procedure: Right sacral lateral branch block

Referring Physician: DARNALL  HOSPITAL

PROCEDURE NOTE: This patient is being treated for low back pain and is exquisitely tender over his right SI joint provocative maneuvers for low back pain in this area such as a Gaenslens test, Faber test, and compression test of the sacroiliac joint. We have done SI joint injection with some relief in this area so we are hoping to proceed with these blocks today for diagnostic purposes and also to pursue RFA In the future.

Lumbosacral Medial Branch S1, S2, S3, RIGHT:   .

Levels treated medial branch S1, S2, S3.

CPT Codes
64493 x 1
64494 x 2

---

147.    The procedure note for these two patients are almost word-for-word identical.

148.    There are two notable differences. First, the second to last paragraph of the procedure note on A.M.'s chart reads "[w]ith reference to the S1, S2, and S3 foramina. Fluoroscopic visualization is used to identify each foramina independently," whereas the corresponding paragraph on J.D.'s chart states, "[w]ith reference to the S1, S2, S3, and S4 foramina. Fluoroscopic visualization is used to identify each foramina independently

149.    But notably, the next paragraph is identical on both charts, despite the fact that A.M.'s chart indicates earlier that he is only indicated for injections involving S1, S2, and S3.

27

**PROCEDURE:**

The procedure has been described to the patient in detail. We have utilized anatomic models, computer animation, and radiofrequency lesioning needles to describe the procedure. Expectations, potential benefits, and risks are outlined in detail. The patient describes understanding. The patient would like to move forward with the procedure.

 AGE: REDACTED, DOB: REDACTED

---

**<u>Central Texas Day Surgery Center</u>**
Paul A. Sardella, M.D.
3800 S. WS Young Suite 204 Killeen, TX 76542
Office: (254)213-0489        Fax: (254)213-0875

The patient is placed in the prone position. Pillows are placed under the abdomen for lumbar spine flexion. The patient's head is resting comfortably on pillows. The lumbosacral spine is widely prepped with sterile preparation solution. Sterile drapes are applied for observance of sterile technique. Surgical sterile technique was observed throughout the procedure without a break in sterile technique.

C-arm is utilized for placement of the needles. The fluoroscopic beam is oriented and anterior to posterior position with approximately 15° of ipsilateral obliquity and approximately 10° of caudal rotation. A 20-gauge  needle inserted through the skin under fluoroscopic visualization at all levels.

With reference to the S1, S2, and S3 foramina. Fluoroscopic visualization is used to identify each foramina independently.

The S1, S2, S3, and S4 foramina are noted at the 3:00 position. Local anesthetic is applied as a skin wheal. Utilizing a 20-gauge needle, under fluoroscopic guidance the needle was advanced to the 3:00 position at all 4 levels. Lateral projection showed no embarrassment of the neuroforaminal canal. 1 cc of 2% lidocaine is deposited through the needle at the foramina openings. This is the diagnostic volume.

The procedure was well tolerated by the patient.

Relief Noted By the patient was : 40%

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**PROCEDURE:**

The procedure has been described to the patient in detail. We have utilized anatomic models, computer animation, and radiofrequency lesioning needles to describe the procedure. Expectations, potential benefits, and risks are outlined in detail. The patient describes understanding. The patient would like to move forward with the procedure.

The patient is placed in the prone position. Pillows are placed under the abdomen for lumbar spine flexion. The patient's head is resting comfortably on pillows. The lumbosacral spine is widely prepped with sterile preparation solution. Sterile drapes are applied for observance of sterile technique. Surgical sterile technique was observed throughout the procedure without a break in sterile technique.

J[REDACTED], DOB: [REDACTED]

**Central Texas Day Surgery Center**
Scott A. Irvine, D.O.
3800 S. WS Young Suite 204 Killeen, TX 76542
Office: (254)213-0489     Fax: (254)213-0875

C-arm is utilized for placement of the needles. The fluoroscopic beam is oriented and anterior to posterior position with approximately 15° of ipsilateral obliquity and approximately 10° of caudal rotation. A 20-gauge  needle inserted through the skin under fluoroscopic visualization at all levels.

With reference to the S1, S2, S3, and S4 foramina. Fluoroscopic visualization is used to identify each foramina independently.

The S1, S2, S3, and S4 foramina are noted at the 3:00 position. Local anesthetic is applied as a skin wheal. Utilizing a 20-gauge needle, under fluoroscopic guidance the needle was advanced to the 3:00 position at all 4 levels. Lateral projection showed no embarrassment of the neuroforaminal canal. 1 cc of 2% lidocaine is deposited through the needle at the foramina openings. This is the diagnostic volume.

The procedure was well tolerated by the patient.

Relief Noted By the patient was :

150.     This is just one example of cloned charts that exist for IPA and CDTCS.

151.     Given that each patient has different needs and medical issues, each patient chart should vary as to description of procedures and the patient's response.

152.     Such practices, as demonstrated here, suggest that IPA and CTDSC are billing for services either not performed as described or that are not medically necessary.

29

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

153.    In an email discussing a MOMI representative's discussion with Dr. Irvine, the MOMI representative even points out that CDTSC and IPA use templates.

> **From:** Central Texas Day Surgery Center Manager [mailto:manager@centexdsc.com]
> **Sent:** Wednesday, September 11, 2013 11:41 AM
> **To:** Lydia Bailey
> **Subject:** Re: TFESI Dictation
>
> Just spoke with Dr. Irvine again. He will now be injecting TWO levels for ALL TFESI's. So from here foward, all TFESI should be billed using both 64483, and 64484. All templates again have been changed to reflect 2 CC or 80 mg of Kenalog. But again, there will not be a single level dictation for TFESI, two levels should be dictated/billed for every TFESI.
>
> Let me know if you have any questions!
>
> Dr. Irvine also stated that Dr. Marsh's dictation should be checked as well regarding the 1 cc/40 mg Kenalog drawn up and total dose of 80 mg Kenalog used. He said that he got it from him. 😊
>
> Thanks!!
>
> --Martha Keim

154.    This email also demonstrated that Dr. Irvine instructed MOMI to always bill for two levels for transforaminal epidural injections, regardless of what was indicated on a chart.

## H.    Defendants Disobey Strict Regulations Concerning Ambulatory Surgical Centers.

155.    Medicare regulations define an ambulatory surgical center, which Central Texas Day Surgery Center is, as: "[A]ny distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following an admission." 42 C.F.R. § 416.2.

156.    The CMS Interpretive Guidelines for Ambulatory Surgical Centers state, in part:

> An ASC satisfies the criterion of being a "distinct" entity when it is wholly separate and clearly distinguishable from any other healthcare facility or office-based physician practice. The ASC is not required to be housed in a separate building from other healthcare facilities or physician practices, but, in accordance with National Fire Protection Association (NFPA) Life Safety Code requirements (incorporated by cross reference at §416.44(b)), it

30

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

must be separated from other facilities or operations within the
same building by walls with at least a one-hour separation. If there
are State licensure requirements for more permanent separations,
the ASC must comply with the more stringent requirement.

CENTERS FOR MEDICARE & MEDICAID SERVICES, MEDICARE STATE OPERATIONS MANUAL,

APPENDIX L 33, *available at* http://www.cms.gov/Regulations-and-

Guidance/Guidance/Manuals/downloads/som107ap_l_ambulatory.pdf.

157.    These regulations allow an ASC that is run by a physician's office to be in the

same building and share certain common spaces, "such as a reception area, waiting room, or

restrooms…as long as they are never used by more than one of the entities at any given time, and

as long as this practice does not conflict with State licensure or other State law requirements." *Id.*

158.    The Interpretive Guidance goes on to say, "In other words, if a physician owns an

ASC that is located adjacent to the physician's office, the physician's office may, for example,

use the same waiting area, as long as the physician's office is closed while the ASC is open and

vice-versa. The common space may not be used during concurrent or overlapping hours of

operation of the ASC and the physician office." *Id.*

159.    The Guidance notes "[C]are must be taken when such an arrangement is in use to

ensure that the ASC's medical and administrative records are physically separate." *Id.* at 33-34.

160.    IPA's Killeen location and CTDSC are located in the same building.

161.    CTDSC and IPA are open on the same days, at the same times, and the same

providers are scheduled to perform services in both practices.

162.    For example, MOMI received charts for billing from both IPA and CTDSC for

billing on November 6, 2013.

31

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

163.    The full November 6, 2013 appointment schedule for CTDSC shows a full day of appointments scheduled from 8:00 AM until 4:15 PM.

164.    The IPA full appointment schedule also shows a full day of appointments scheduled that day from 8:00 AM until 4:15 PM.

165.    Based on observation, Edwards knows that Defendants take no steps to separate the IPA practice from CTDCS's ASC practice, as required by law.

### COUNT I
### Violation of Federal False Claims Act as to All Defendants
### 31 U.S.C. § 3729(a)(1) (*Before May 20, 2009*)
### 31 U.S.C. § 3729(a)(1)(A) (*On or After May 20, 2009*)

166.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

167.    Defendants violated the federal False Claims Act by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval by the Medicare and Tricare programs.

168.    Defendants submitted and caused to be submitted claims for payment for services that were never performed or were medically unnecessary.

169.    Defendants submitted and caused to be submitted claims for payment for services that were never provided at all, only provided in part, or double-billed as if IPA and CTDCS both performed the same set of services, when that was not the case.

170.    Additionally, Defendants submitted and caused to be submitted claims for payment for services billed incident to a physician's UPIN, when the physician had no role in developing the plan of care for the patient as required by the incident-to rules.

171.    Defendants nevertheless affirmatively, and knowingly, falsified the amount and type of services rendered and the medical necessity of the services to claim that the services were covered, and billed the Medicare and Tricare programs for the services

172.    As a result of this conduct, and in reliance on the false claims submitted or caused to be submitted, the U.S. paid out, and Defendants received payments from the Medicare and Tricare programs for these services.

## COUNT II
### Violation of Federal False Claims Act as to All Defendants
### 31 U.S.C. § 3729(a)(2) (*Before June 7, 2008*)
### 31 U.S.C. § 3729(a)(1)(B) (*On or After June 7, 2008*)

173.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

174.    Defendants violated the federal False Claims Act by knowingly making, using, or causing to be made or used, false records or statements that were material to false or fraudulent claims.

175.    Defendants made and used patient notes and superbills when providing pain management services to Medicare and Tricare, and such patient notes and superbills were false in that they misrepresented the amount of services rendered, the type of services rendered, and in some cases represented that services that were never rendered were in fact rendered, as well as the necessity of the services provided

176.    These false records were material to Defendant's false claims for payment from the Medicare and Tricare program because they disguised the fact that the services for which the claims were submitted were not covered by the programs, and that no payments were due from the programs for such services.

33

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

177.    Defendants had actual knowledge that the records were false because they specifically inserted the false information, affirmatively changed information to make it false, used pre-canned templates, or instructed their employees and agents to include the false information. At a minimum, Defendants acted in reckless disregard or deliberate ignorance of the truth.

178.    As a result of this conduct, and in reliance on the falsified documents, the U.S. paid, and the Defendants received payments from the Medicare and Tricare programs.

## COUNT III
### Violation of Federal False Claims Act as to All Defendants
### 31 U.S.C. § 3729(a)(3) (*Before June 7, 2008*)
### 31 U.S.C. § 3729(a)(1)(C) (*On or After June 7, 2008*)

179.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

180.    Defendants violated the False Claims Act by conspiring to knowingly commit a violation of § 3729(a)(1)(A) and/or (B) against the Medicare and Tricare programs.

181.    Defendants through their dual corporate structure and various entities conspired to present or cause to be presented false claims for services that were never performed, and services that were medically unnecessary, as well as services that were not performed incident to a physician's services.

182.    As a result of this conduct the U.S. paid out, and Defendants received payments from the Medicare and Tricare programs for these services.

## COUNT IV
### Violation of Texas Medicaid Fraud Prevention Act as to All Defendants
### Tex. Human Res. Code § 36.002(1)

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

183.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

184.    Defendants violated the Texas Medicaid Fraud Prevention Act by knowingly making or causing to be made false statements or misrepresentations of material facts to permit themselves to receive benefits or payments under the Medicaid program that are not authorized or that are greater than the benefits or payments that are authorized.

185.    Defendants submitted and caused to be submitted claims for payment for services that were never provided at all, only provided in part, or double-billed as if IPA and CTDCS and IPA both performed the same set of services, when that was not the case.

186.    Defendants nevertheless affirmatively, and knowingly, falsified the amount and type of services rendered to claim that the services were covered, and billed Medicaid for the services.

187.    As a result of this conduct, and in reliance on the false claims submitted or caused to be submitted, the State of Texas paid out, and Defendants received, payments from Medicaid for these services.

## COUNT V
### Violation of Texas Medicaid Fraud Prevention Act as to All Defendants
### Tex. Human Res. Code § 36.002(7)(B)

188.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

189.    Defendants violated the Texas Medicaid Fraud Prevention Act by knowingly making or causing to be made claims under the Medicaid program for services that were medically unnecessary or inappropriate when compared to generally recognized standards within the healthcare industry.

35

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

190.    Defendants nevertheless affirmatively, and knowingly falsified records to indicate medical necessity for services where medical necessity did not exist, and billed Medicaid for the services.

191.    As a result of this conduct, and in reliance on the false claims submitted or caused to be submitted, the State of Texas paid out, and Defendants received payments from Medicaid for these services.

### COUNT VI
### Violation of Texas Medicaid Fraud Prevention Act as to All Defendants
### Tex. Human Res. Code § 36.002(8)

192.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

193.    Defendants violated the Texas Medicaid Fraud Prevention Act by making claims under the Medicaid program for services billed to a physician's UPIN, when a non-physician performed the services and the physician had no role in developing the plan of care for the patient as required by the incident-to rules.

194.    As such, Defendants submitted and caused to be submitted claims for payment of services which did not indicate the type of license and identification number of the licensed health care provider who actually provided the services.

195.    Defendants nevertheless affirmatively, and knowingly, falsified records to indicate the performance of services by physicians when those physicians had no part in the services performed, and billed Medicaid for the services at the higher reimbursement rate authorized for physicians.

36

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

196.    As a result of this conduct, and in reliance on the unlawful acts described herein, the State of Texas paid out, and Defendants received, payments from Medicaid for these services.

**COUNT VII**
**Violation of Texas Medicaid Fraud Prevention Act as to All Defendants**
**Tex. Human Res. Code § 36.002(9)**

197.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

198.    Defendants violated the Texas Medicaid Fraud Prevention Act by conspiring to violate subdivisions § 36.002(1), (7)(B), and/or (8).

199.    Defendants, through their dual corporate structure and various entities, conspired to violate the TMFPA.

200.    As a result of this conduct, the State of Texas paid out, and Defendants received payments from the State's Medicaid program for these services.

**PRAYER FOR RELIEF**

201.    Relator Susan Edwards, acting on behalf of, and in the name of, the United States of America and the State of Texas, and on her own behalf, prays that judgment be entered against Defendants and in favor of the U.S.A., Texas, and herself for violations of the False Claims Act and the Texas Medicaid Fraud Prevention Act as follows:

(a)    That the United States be awarded three times the amount of damages which it sustained because of the acts of Defendants pursuant to the FCA; and that Texas be awarded three times the amount of any payment provided under the Medicaid program as a result of Defendants' unlawful acts, pursuant to the TMFPA;

(b)    That Defendants each be held liable for civil penalties of up to $11,000.00, but not less than $5,500.00 (as adjusted pursuant to §3729(a)(1) of the FCA), to the U.S. for each and every act in violation of the FCA; and that

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

Defendants each be held liable for civil penalties of up to $15,000.00, but not less than $5,000.00 to the State of Texas for each and every unlawful act in violation of the TMFPA, pursuant to §§36.052(a)(3) and 36.052(b) of the TMFPA;

**(c)**    That this Court award pre-judgment and post-judgment interest, as appropriate, at the highest rate allowed by law;

**(d)**    That in the event the United States intervenes in this action and takes over its prosecution, the Relator be awarded an amount for bringing this action for the United States of at least 15% but not more than 25% of the proceeds paid to the United States resulting from the trial or settlement of the claim, pursuant to §3730(d)(1) of the FCA; and that in the event the State of Texas intervenes in this action and takes over its prosecution, the Relator be awarded an amount for bringing this action for the State of Texas of at least 15% but not more than 25% of the proceeds paid to the State of Texas resulting from the trial or settlement of the claim, pursuant to §36.110(a) of the TMFPA;

**(e)**    That in the event the United States does not intervene in this action, the Relator be awarded an amount for collecting the civil penalties and damages for the United States of at least 25% but not more than 30% of the proceeds paid to the United States resulting from the trial or settlement of the claim, pursuant to §3730(d)(2) of the FCA; and that in the event the State of Texas does not intervene in this action, the Relator be awarded an amount for collecting the civil penalties and damages for the State of Texas of at least 25% but not more than 30% of the proceeds paid to the State of Texas resulting from the trial or settlement of the claim, pursuant to §36.110(a-1)of the TMFPA;

**(f)**    That this Court award reasonable attorneys' fees, costs, and expenses to Relator, which were necessarily incurred in bringing and prosecuting this case, pursuant to §3730(d)(1) or (2) of the FCA and §36.110(c) of the TMFPA; and

**(g)**    That this Court award such other relief as it deems just, necessary and fair.

## JURY DEMAND

202.    Relator requests a trial by jury of all issues so triable.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

Dated: April 17, 2015

Respectfully Submitted,

*R. Scott Oswald by Jan Soifer with permission*

R. Scott Oswald (to be admitted *pro hac vice*)
David Scher (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com

Attorneys for *Qui Tam* Plaintiff

Jan Soifer
Texas Bar No. 18824530
Patrick J. O'Connell
Texas Bar No. 15179900
O'CONNELL & SOIFER LLP
98 San Jacinto Blvd., Suite 540
Austin, Texas 78701
(512) 222-0444
(512) 222-0422 (facsimile)
jsoifer@oconnellsoifer.com
poconnell@oconnellsoifer.com

Local Counsel for *Qui Tam* Plaintiff